The Law Offices of Avrum J. Rosen, PLLC
*Proposed Counsel to Serious Fun After School. Inc.*
38 New Street
Huntington, New York 11743
(631) 423-8527
Avrum J. Rosen, Esq.
Daniel J. LeBrun, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:                                                                    Chapter 11 (Subchapter V)

SERIOUS FUN AFTER SCHOOL, INC.                Case No. 24-24-44951-ess
*dba* SERIOUS FUN @ P.S. 17,
*fdba* SERIOUS FUN @ P.S. 84,
*dba* SERIOUS FUN @ P.S. 85Q,
*dba* SERIOUS FUN @ P.S. 150,
*fdba* SERIOUS FUN @ P.S. 166Q,

                                        Debtor.
------------------------------------------------------------X

### DEBTOR'S MOTION FOR INTERIM ORDER UNDER
### 11 U.S.C. §§ 105, 361 AND 363 AND FED. R. BANKR. P. 4001
### AUTHORIZING DEBTOR TO USE CASH COLLATERAL AND
### GRANTING ADEQUATE PROTECTION TO THE LENDERS AND
### SCHEDULING A FINAL HEARING UNDER BANKRUPTCY RULE 4001(B)

**TO:    THE HONORABLE ELIZABETH S. STONG**
       **UNITED STATES BANKRUPTCY JUDGE**

Serious Fun After School, Inc., *dba* Serious Fun @ P.S. 17, *fdba* Serious Fun @ P.S. 84,

*dba* Serious Fun @ P.S. 85Q, *dba* Serious Fun @ P.S. 150, *fdba* Serious Fun @ P.S. 166Q, the

debtor and the debtor in possession (the "Debtor"), by and through its proposed attorneys, the Law

Offices of Avrum J. Rosen, PLLC, respectfully submits this as and for its motion (the "Motion")

seeking the entry of an interim order (the "Interim Order"), pursuant to sections 105, 361 and 363

of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and E.D.N.Y. LBR 4001-5: (i) authorizing the

Debtor to use the cash collateral (the "Cash Collateral") of: (a) First Central Savings Bank

("FCSB"), a pre-petition lender secured against, among other things, all of the Debtor's personal

property, including all tangible and intangible assets and accounts receivable; and (b) the Small

Business Administration (the "SBA", together with FCSB, the "Cash Collateral Lenders"); and (ii)

scheduling a final hearing (the "Final Hearing") to consider the entry of a final order (the "Final

Order") authorizing the Debtor's use of the Cash Collateral.  In support of this Motion, the Debtor

submits the Debtor's Affidavit Pursuant to Local Rule 1007-4 and Affidavit in Support of First Day

Motions, executed by Sylvia Sewell ("Sewell"), the Executive Director of the Debtor.  In further

support of this Motion, the Debtor respectfully states as follows:

## SUMMARY OF CASH COLLATERAL TERMS

1.      Under Bankruptcy Rule 4001 and E.D.N.Y. LBR 4001-5, the following are the

material provisions regarding the Debtor's proposed use of cash collateral (as defined in Bankruptcy

Code section 363(a)):

> **Parties with Interest in Cash Collateral** (Bankr. R. 4001(b)(1)(B)(i): The Cash Collateral Lenders hold security interests in all of the Debtor's personal property, including but not limited to the Debtor's cash, accounts, equipment, inventory, and general intangibles. Upon information and belief, each of the Cash Collateral Lenders have recorded UCC-1 financing statements in accordance with their respective liens. The Debtor's source of income is from monthly payments from the families of its students and governmental grants.

> **Use of Cash Collateral** (Bankr. R. 4001(b)(1)(B)(ii): The Debtor is authorized to use the Cash Collateral in accordance with, and subject to, the budget (the "Budget") in order to satisfy the post-petition costs and expenses of the continued operations of its business. The initial budget (the "Initial Budget"), commencing November 25, 2024, and covering a thirteen (13) week period, is annexed to this Motion and the proposed Interim Order as **Exhibit "A"**.

> **Adequate Protection for the Cash Collateral Lenders** (Bankr. R. 4001(b)(1)(B)(iv): As adequate protection for any diminution in the value of the Cash Collateral Lenders' interest in their collateral resulting from (a) the Debtor's use of Cash Collateral; (b) use, sale or lease the Debtor's personal property; or (c) the imposition of the automatic stay under section 362(a) of the Bankruptcy Code (the aggregate amount of such diminution is referred to hereinafter as the "Adequate Protection Lien"), the Cash Collateral Lenders shall receive the following adequate protection: (i) replacement

liens pursuant to section 361(2) of the Bankruptcy Code (the "<u>Replacement Liens</u>") on all property of the Debtor and its estate, whether now owned or hereafter acquired (collectively, the "<u>Post-petition Collateral</u>"), to the extent required by the pre-petition loan documents (the "<u>Loan Documents</u>"), and to the same extent and validity as its pre-petition liens; and (ii) continued payments on the loans.

**Carve Out.**  The Adequate Protection Liens shall be subject to the following carve outs (collectively, "<u>Carve Out</u>"): (i) All fees required to be paid to the Clerk of this Court and the Subchapter V Trustee, as allowed by the Court, the Bankruptcy Code and the Bankruptcy Rules; (ii) All reasonable fees and expenses up to, and not to exceed $10,000.00 incurred by a trustee under Bankruptcy Code section 726(b); (iii) To the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued and unpaid fees and expenses ("<u>Allowed Professional Fees</u>") incurred by persons or firms retained by Debtor under Bankruptcy Code sections 327, 328, or 363 ("<u>Debtor's Professionals</u>") and any statutory committee appointed under Bankruptcy Code sections 328 or 1103 ("<u>Committee</u>") (collectively, Committee and Debtor's Professionals "Professional Persons"), at any time before or on the date of a carve out trigger notice ("<u>Carve Out Trigger Notice</u>"), whether allowed by this Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons incurred on and after the first business day following delivery of the Carve Out Trigger Notice shall be subject to an aggregate cap of fifty thousand dollars ($50,000.00).

**Material Terms, Including Duration, of the Use of Cash Collateral** (Bankr. R. 4001(b)(1)(B)(iii): The Debtor's authorization to use Cash Collateral shall commence as of the entry of the Interim Order and terminate upon the earliest of (i) the date that is ninety-one (91) days after the Petition Date; (ii) entry of a Final Order or a further interim order authorizing the Debtor's use of Cash Collateral; or (iii) the occurrence of a Termination Event (the "<u>Termination Date</u>").

Occurrence of the Termination Date shall terminate the rights of the Debtor to use Cash Collateral hereunder but shall not in any manner affect the rights of any secured party or in any manner the validity, priority, enforceability or perfected status of any Replacement Liens.

<u>Termination Event</u>: The occurrence of any of the following events, shall constitute a Termination Event: (i) this Chapter 11 case shall have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or there shall have been appointed in the Chapter 11 case, a trustee, other than a Subchapter V trustee, or examiner with expanded powers beyond the authority to investigate particular activities of the Debtor; (ii) the Interim Order is modified, vacated, stayed, reversed, or is for any reason not binding

on the Debtor; (iii) the failure of the Debtor to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order after notice of said default and an opportunity to cure; (iv) a default by the Debtor in reporting financial information as and when required under the Interim Order, continued uncured for a fifteen (15) day period; or (iv) a variance, resulting from the Debtor's expenditures as set forth in the Budget that exceeds ten percent (10%) per line item or five percent (5%) in the overall Budget, unless caused by an increase in the Debtor's business.

Remedies: Any secured party shall provide the Debtor, counsel for any Committee (and if no Committee is appointed, the 20 largest creditors of the Debtor), other secured parties, the Office of the United States Trustee, and the Subchapter V trustee with written notice of the occurrence of a Termination Event (the "Remedies Notice"). Upon the expiration of ten (10) business days after the Debtor, counsel for the Committee (and if no Committee is appointed, the 20 largest creditors of the Debtor) and the U.S. Trustee's receipt of the Remedies Notice, and the Debtor has failed to cure the alleged Termination Event, the secured party may move the Court on seven (7) days' notice for an order lifting the automatic stay provisions of section 362 of the Bankruptcy Code to the extent necessary to permit that secured party to exercise its rights and remedies against the Debtor and its collateral, including, but not limited to, its right to set off against any existing Cash Collateral. The Debtor's right to use the Cash Collateral shall terminate upon the expiration of the ten-day cure period.

Determination of Validity, Enforceability and Amount of the Security Interests: The Interim Order does not contain an acknowledgment by the Debtor as to the validity, enforceability and amount of such obligation and security interest. Debtor expressly reserves its rights in that regard.

## JURISDICTION

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding as that term is defined within 28 U.S.C. § 157(b)(2). Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.      On November 25, 2024 (the "Petition Date"), the Debtor filed a voluntary petition

for relief pursuant to Chapter 11 of the Bankruptcy Code and elected to proceed under Subchapter

V.

4.      The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in this case, except that a Subchapter V trustee will be appointed in accordance with section 1183 of the Bankruptcy Code.

5.      The Debtor is a New York Not-For-Profit 501(c)(3) Corporation with corporate offices located at both 28-07 Jackson Avenue, 8th Floor, Long Island City, New York 11101 and 237 Lincoln Avenue, Sayville, New York 11782.

6.      The Debtor is a fully licensed after school arts enrichment program which provides children with the opportunity to learn, play, and have fun after school and during school breaks, offering families convenient, flexible, and accessible programs.

## FCSB LOAN

7.      On or around December 12, 2017, the Debtor executed a Commercial Loan Agreement for Revolving Draw Loan and a Promissory Note (the "FCSB Note") in favor of FCSB in the original principal amount of approximately $100,000.00. To secure repayment of the FCSB Note, on or around December 12, 2017, the Debtor also executed a security agreement encumbering all of the Debtor's personal property, including but not limited to accounts and general intangibles (the "FCSB Security Agreement" and the FCSB Note, collectively, the "FCSB Loan").

8.      A UCC-1 financing statement with respect to the FCSB Loan was recorded on December 12, 2017, bearing filing number 201712126500952, and a continuation was filed on November 18, 2022.

9.      The FCSB Loan has been extended from time to time by agreement between FCSB and the Debtor, and the current expiration date is set for June 4, 2025.

10.     The Debtor maintains its contractual payments to FCSB of approximately $850.00 per month, and as of the Petition Date, the Debtor was indebted to FCSB in the total amount of approximately $100,000.00.

SBA EIDL LOAN

11.     On or around May 20, 2020, the Debtor executed a Loan Authorization Agreement and Note (the "SBA Note") in favor of the SBA in the original principal amount of approximately $150,000.00. By later agreement between the Debtor and the SBA, the SBA Note was modified such that the principal balance was raised to $500,000.00. To secure repayment of the SBA Note, on or around May 20, 2020, the Debtor also executed a security agreement encumbering all of the Debtor's personal property, including but not limited to accounts and general intangibles (the "SBA Security Agreement" and the SBA Note, collectively, the "SBA Loan").

12.     A UCC-1 financing statement with respect to the SBA Loan was recorded on May 29, 2020, bearing filing number 202005295740184.

13.     The SBA Loan has a maturity date of May 20, 2050.

14.     The Debtor maintains its contractual payments to the SBA of $2,206.00 per month, and as of the Petition Date, the Debtor was indebted to the SBA in the total amount of approximately $496,076.68.

ITRIA VENTURES LLC

15.     Prior to the Petition Date, in or around August 2023, the Debtor was referred to Itria Ventures LLC ("Itria") a Merchant Cash Advance company ("MCA").

16.     On or around October 14, 2024, the Debtor executed what is labeled as a "Receivables Sale Agreement" with Itria (the "Itria Agreement"), by which, Itria purportedly purchased $384,750.00 in the Debtor's receivables for a purchase price of $285,000.00.

17.     The Debtor takes the position that the Itria Agreement does not constitute a "true sale" of the Debtor's accounts receivable, and rather, that it is a disguised loan. The Court is referred to the Debtor's Affidavit Pursuant to Local Rule 1007-4 for the factual history underlying the Itria Agreement.

18.     Upon information and belief, UCC-1 financing statements with respect to the Itria Agreement were previously filed and with each new loan, additional UCC-1's were filed with the lates ones being recorded on October 16, 2024, bearing filing numbers 202410166427157, 202410166427210, 202410166427246, 202410166427284, and 202410166427335[1].

19.     Pursuant to the Itria Agreement, the Debtor purportedly pledged 22.79% of its receivables to Itria, to be paid in the amount of $7,399.04 per week, until the total amount of $384,750.00 is received by Itria.

20.     The Debtor believes that there are serious issues with the Itria Agreement, such that agreement does not constitute a "true sale" of the Debtor's receivables.

21.     First, Itria is not at risk for these funds.  The Itria Agreement contains a provision that grants a security interest in all of the assets of the Debtor to collateralize the alleged "sale", and is not limited to the Debtor's receivables. Further, the Itria Agreement also contains an indemnification provision for any loss, further proving that this is a disguised loan.

22.     Second, even though this is a not-for-profit entity, the Itria Agreement also required the Debtor's Executive Director, Sylvia Sewell, to give a "good guy" guarantee, and required a confession of judgment that contained no such limitations.

---

[1] The UCC-1s which were filed are in the name of CORPORATION SERVICE COMPANY, AS REPRESENTATIVE, however upon information and belief, these relate to the Itria Agreement based upon the timing of the execution of the Itria Agreement and the filing of the UCC-1s.

23.     Third, on an even more fundamental level, Itria was on notice, through the filed UCC-1s of FCSB and the SBA, that all of the Debtor's accounts receivable were already pledged to them.  Thus, the Debtor had nothing to sell.

24.     Fourth, Itria has overdrawn the Debtor's bank account several times. The Debtor, through its Executive Director, has sought reconciliation of the weekly amount payable ($7,399.04) on several occasions to make the payments resemble a more accurate reflection of 22.79% of the Debtor's receivables, which it is entitled to do under the Itria Agreement. The Debtor's Executive Director was advised that the payment schedule could not be changed, thus nullifying the reconciliation provision in the Itria Agreement. Without a reconciliation provision, this can hardly be defined as a "true sale".

25.     Last, but not least, Itria, whose MCA agreement is expressly governed by New York Law, never obtained a Board resolution authorizing the MCA and, of even greater import, never sought either court of the N.Y. Attorney General's approval of this secured loan which is required pursuant the New York Not-for-Profit Corporation Law ("N-PCL") §§ 511 and 511-a.

26.     As such, the Debtor does not believe that Itria's interest in the Debtor's receivables constitutes a valid security interest and lien as of the Petition Date and, therefore, is not entitled to adequate protection of its interest. To the extent that Itria is entitled to adequate protection, it shall be granted replacement liens, pending resolution of its secured status.

## **RELIEF REQUESTED**

27.     By this Motion, the Debtor requests the entry of an interim order, substantially in the form annexed hereto, authorizing:

> (i)     the Debtor to use the Cash Collateral, in which the Cash Collateral Lenders have an interest, in accordance with the Budget;

> (ii)    the granting of adequate protection to the Cash Collateral Lenders with respect to the use of the Cash Collateral; and

(iii)    the scheduling of a Final Hearing to be held no earlier than fourteen (14) days after the entry of the Interim Order to consider the entry of the Final Order.

27.    The Debtor submits that absent authorization to use Cash Collateral to allow this Debtor to continue its post-petition operation, the Debtor, its estate, and its creditors will suffer immediate and irreparable harm.

**BASIS FOR RELIEF**

28.    Bankruptcy Code section 363 governs the Debtor's use of property of the estate. Bankruptcy Code section 363(c)(1) provides that:

> If the business of the debtor is authorized to be operated under section 1108 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

29.    Bankruptcy Code section 363(c)(2), however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course as set forth in Bankruptcy Code section 363.  Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

(A)    each entity that has an interest in such collateral consents; or

(B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

30.    Accordingly, under Bankruptcy Code section 363(c)(2), a debtor may not use cash collateral without the consent of the secured party, or approval from the Court. The Debtor submits that, under the circumstances here, including the Debtor's need to use Cash Collateral and the

adequate protection afforded to the secured party, its request to use Cash Collateral should be granted.

## DEBTOR'S NEED TO USE CASH COLLATERAL

31.     The Debtor has significant and immediate cash needs to continue paying its ongoing obligations as a debtor in possession and propose a plan of reorganization and emerge from bankruptcy.  Reorganization under Chapter 11 is critical to preserving the Debtor's value as a going concern.  As shown in the Budget, the Debtor anticipates that the expenses of the Debtor for the next thirteen (13) weeks will total approximately $242,202.50 exclusive of payments to the Cash Collateral Lenders. The Debtor expects receipts to total approximately $367,902.18

32.     The Debtor's immediate need for the use of cash collateral is based upon the Debtor's need to meet is lease obligation and payroll, to provide supplies for its programs, and other operating expenses. By meeting these post-petition, administrative expenses, the Debtor will protect the assets of its creditors and preserve the value of its business as a going concern.

## PROPOSED ADEQUATE PROTECTION

33.     To the extent that the Cash Collateral Lenders' interest in the Cash Collateral constitutes a valid and perfected security interest and lien as of the Petition Date, they are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Cash Collateral.  Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property used or proposed to be used by the debtor, the Court shall prohibit or condition such use as is necessary to provide "adequate protection" of that interest.

34.     What constitutes "adequate protection" is a "fact-specific inquiry".  *See, In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).  The purpose of adequate protection is to prevent the diminution in the value of the secured creditor's interest in their collateral during the reorganization process. *See, In re WorldCom. Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004)

("The legislative history for section 361 of the Bankruptcy Code, which sets forth adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives value for which the creditor bargained for prior to the debtor's bankruptcy."): *In re Gallegos Research Group Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (*citing United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc. Ltd.,* 484 U.S. 365 (1988)) ("[T]o determine whether an entity is entitled to adequate protection and the type and amount of adequate protection required, a court must determine the value of the collateral; the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case"); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus is on protection of the secured creditor from diminution in value of its collateral during reorganization process). However, "[a]dequate protection, not absolute protection, is the statutory standard." *In re Beker Indus.*, 58 B.R. at 736.

35.    The Debtor proposes, subject to this Court's approval, to provide the Cash Collateral Lenders with the following adequate protection:

> i.    Replacement Liens on the Post-petition Collateral to the same extent and validity as its pre-petition liens; provided, however, that the Post-petition Collateral shall not include any recoveries under Chapter 5 of the Bankruptcy Code and are further subject to the Carve Out described herein;

> ii.    **Carve Out**: The Adequate Protection Liens shall be subject to the following Carve Out: (i) all fees required to be paid to the Clerk of this Court and the Subchapter V Trustee, as allowed by the Court, the Bankruptcy Code and the Bankruptcy Rules; (ii) the payment of allowed professional fees and disbursements incurred by the Debtor's professionals retained by an Order of the Bankruptcy Court, and any statutory committee appointed in this case pursuant to fee orders or any Monthly Compensation Order, and in the event of a default that results in the termination of the Debtor's authorization to use cash collateral, unpaid Professional Fees and Disbursements incurred prior to delivery of a carve out trigger notice in accordance with the Budget not to exceed the sum of $50,000.00; (iii) any recoveries in favor of the estate pursuant to Chapter 5 of the

> Bankruptcy Code; and (iv) any amounts allowed by the Court as fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000.00.

36.     The Debtor will provide the Cash Collateral Lenders, upon ten (10) business day's written notice, at any time during the Debtor's normal business hours, the right to inspect, audit, examine, check, make copies of or extract from the books and records of the Debtor, and monitor the Collateral, and the Debtor will make all of the same reasonably available to the Cash Collateral Lenders and their representatives, for such purposes.

37.     The Debtor will provide the Cash Collateral Lenders with the right to inspect the location and the Debtor's books and records upon reasonable request and will further provide the Cash Collateral Lenders with all of the Debtor's operating reports on a timely basis.

## THE BUDGET

38.     The Debtor has prepared and provided an initial three-month Budget (which is annexed to the Interim Order).  The initial Budget has been thoroughly reviewed by the Debtor and its management and sets forth the periods covered thereby, among other things, the Debtor's projected monthly disbursements for each month commencing with the month starting on the Petition Date.

## NOTICE

39.     Notice of the Motion shall be given to: (i) the Office of the United States Trustee; (ii) the Subchapter V trustee; (iii) the Debtor's 20 largest unsecured creditors; (iv) the Cash Collateral Lenders; and (v) any party having filed a notice of appearance in the case.

## <u>NO PRIOR REQUEST</u>

40.    The Debtor has not previously sought the relief sought herein before this Motion.

**WHEREFORE**, the Debtor respectfully requests that this Court enter (i) the proposed Interim Order; (ii) an Order scheduling the Final Hearing; and (iii) such other, further and different relief that this Court deems just, proper and equitable under the facts and circumstances herein.

Dated: November 25, 2024
       Huntington, New York

Respectfully submitted,

**Law Offices of Avrum J. Rosen, PLLC**

By:    */s/ Avrum J. Rosen*
       Avrum J. Rosen, Esq.
       Daniel J. LeBrun, Esq.
       38 New Street
       Huntington, NY 11743
       (631) 423-8527
       arosen@ajrlawny.com
       dlebrun@ajrlawny.com

       *Proposed Counsel to the Debtor*
       *and Debtor in Possession*